# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
December 17, 2013 Session

## JAMES D. HOLDER AND BARBARA L. HOLDER v. S & S FAMILY ENTERTAINMENT, LLC.

**Appeal from the Circuit Court for Sumner County**
**No. 83CCI2011CV725     C. L. Rogers, Judge**

---

**No. M2013-00497-COA-R3-CV- Filed March 19, 2014**

---

This dispute arose at the end of two long-term commercial leases and a contract for the sale of two businesses and their assets, which businesses operated at the leased premises. The issues pertain to what assets were purchased, whether the tenant properly maintained the premises during the lease term, and whether the tenant returned the premises to the landlord in the same condition as at the commencement of the leases. The trial court ruled that the tenant had not purchased the assets in dispute, which the tenant removed at the end of the lease; thus, the tenant was liable for removing the assets. The court also found that the tenant breached both leases by failing to maintain the premises and failing to return the premises in the same condition as at the commencement of the leases. The tenant insists the court erred in finding that the landlord owned the assets in dispute; it also insists it did not breach any duties arising under the leases. The tenant also contends it is not liable for any of the numerous categories of damages awarded because the landlord failed to prove its damages. We affirm the trial court's rulings as to the ownership of the disputed assets and the findings that the tenant breached numerous provisions of the leases. As for the various awards of damages, we affirm in part and reverse in part.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Reversed in Part

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, J.J., joined.

Gerald Neenan and Aubrey B. Harwell, Jr., Nashville, Tennessee for the appellant, S & S Family Entertainment, LLC.

James Lawrence Smith and Karen Keyes Diner, Hendersonville, Tennessee, for the appellees, James D. Holder and Barbara L. Holder.

# OPINION

Plaintiffs James and Barbara Holder ("the Holders") own commercial property in Hendersonville and Gallatin, Tennessee, that are at the center of this controversy. Prior to January 2001, the Holders also owned and operated bowling alleys and/or entertainment centers at these locations, "Hendersonville Fun Center and Circus World" and "Gallatin (Bowling) Lanes."

On January 26, 2001, the Holders entered into a contract to sell the businesses, but not the real property, to S&S Family Entertainment, LLC ("S&S"), an owner and operator of several bowling/entertainment centers. Pursuant to the contract of sale, the Holders agreed to sell the Hendersonville Fun Center and Gallatin Lanes as well a vast array of assets that included furniture, fixtures, and equipment. The contract of sale and subsequent Bills of Sale incorporated "Asset Lists" for each property, which itemized the assets being sold.

The contract of sale also afforded S&S the right to inspect and test all heating, plumbing, and HVAC systems that seller warranted would be in good working order at closing. After hiring a firm to inspect both premises, S&S provided to the Holders copies of professional inspections that reported several problems, including repairs to several heating and air conditioning units. The Holders agreed to make the necessary repairs and, on February 14, 2001, the parties agreed to an Amendment to the Contract to memorialize the Holders' agreement to make such repairs.

Concurrent with the execution of the contract of sale, the parties entered into two separate but substantially similar ten-year commercial leases, one for the Hendersonville Fun Center and one for Gallatin Lanes. The term of each lease ended on May 31, 2011. The leases provide in pertinent part:

13. <u>Lessee's Repairs; Utilities</u>

(a) Lessee will keep, at its own cost and expense, maintain and keep the Demised Premises, including without limitation, all interior walls, doors, plate glass, floors, ceilings, windows in the storefront, showcases, skylights, electrical facilities and equipment, all plumbing, sewage, electrical, sprinkler and HVAC systems (to the extent the same are located within the Demised Premises or serve only the Demised Premises) and light fixtures, as clean and in as good repair as same are at the Commencement Date or may be put in during the continuance thereof, reasonable wear and tear. . .excepted[.]

. . .

19. <u>Surrender.</u> At the expiration or sooner termination of the term of this Lease, Lessee shall peaceably yield, deliver up and surrender to Lessor the physical possession of the Demised Premises and all erections, improvements and additions permanently attached thereto, in as good condition and repair as the same shall be at the commencement of this Lease, loss by fire and/or ordinary wear and tear excepted, and shall deliver all of the keys to the Lessor or to Lessor's agent. At or before the expiration or termination of the Lease, Lessee may remove all the trade fixtures including, but not limited to, all assets purchased under the Contract for Sale by and between Lessor and Lessee and owned by Lessee that can be removed without irreparable injury to or defacement of the Demised Premises, provided (a) all Rents have been paid in full, (b) Lessee is not otherwise in default under this Lease, and (c) all damage to the Demised Premises caused by such removal is properly repaired.

S&S occupied both premises until the expiration of the leases in May 2011. At the end of the lease term, S&S vacated the premises and removed numerous fixtures and items including, *inter alia*, (1) bathroom fixtures including sinks and mirrors, (2) an Ansul fire suppression system and exhaust fans, (3) exit signs and emergency lights, (4) fire extinguishers, (5) menu boards, (6) washer and dryer, and (7) bowling lane beds.

A dispute arose regarding the removal of these items as well as issues pertaining to the alleged failure to maintain HVAC systems, electrical systems, and plumbing, and the amount of damages sustained. Soon thereafter, on June 14, 2011, the Holders filed suit for injunctive relief and damages claiming that S&S had removed items that were not part of the sale of assets, failed to surrender the premises in as good condition and repair as at lease commencement, failed to completely vacate the premises (failed to remove all of S&S' property), and damaged property while moving out. The trial court issued a Temporary Restraining Order the same day, ordering S&S to refrain from altering or destroying the items in dispute.

S&S filed an answer asserting that it purchased all assets in dispute, thereby precluding any award of damages to the Holders. In addition, S&S filed a counterclaim for breach of contract, alleging that the Holders verbally agreed to sell the Hendersonville shopping center to S&S for $3.85 million. Further, S&S asserts that it spent over $75,000 on improvements to the property in reliance on that agreement; however, after making these improvements, the Holders reneged on the agreement and refused to close the sale. Thus, S&S asserts a claim to recover the value of the improvements.

-3-

Following a bench trial, the court dismissed S&S' counterclaim and awarded the Holders damages in the amount of $54,123. The Holders were also awarded attorneys' fees in the amount of $21,500, based upon the attorney fee provision in the lease. S&S appealed the above rulings. We determined that the trial court had not adjudicated all of the issues and remanded for further proceedings. Following remand, the trial court resolved all remaining issues and entered a Final Order on January 14, 2013, in which it awarded the Holders an additional $2,400 in damages relating to Exit Signs/Emergency Lights, for a total award of damages in the amount of $56,523.

The trial court also reaffirmed the award to the Holders of attorneys' fees in the amount of $21,500 based upon the attorney fee provision in the lease. As for S&S' counterclaim for breach of an oral contract to sell the real property, the trial court dismissed that claim finding: "No agreement was ever reached. No written agreement occurred." This appeal followed.

In this appeal, S&S contends the trial court erred in awarding any damages to the Holders because the disputed assets which give rise to the award of damages were sold to S&S pursuant to the contract of sale and bills of sale. It also contends the damages were precluded by the leases because S&S was contractually excused from having to replace capital assets and from having to surrender the premises in a condition better than they were at the beginning of the leases. Alternatively, if this Court finds that a legal basis for damages exists, S&S contends the Holders failed to prove their damages. As for the award of attorneys' fees, S&S contends the court erred by awarding attorneys' fees in favor of the Holders and that S&S is entitled to recover attorneys' fees in the trial court and on appeal. We shall discuss each issue in turn.

**STANDARD OF REVIEW**

The matters at issue on appeal arise from three written agreements: a contract of sale and two commercial leases. The interpretation of a written agreement is a question of law and not of fact, *Guiliano v. Cleo, Inc*. 995 S.W.2d 88, 95 (Tenn. 1999); accordingly, our review of the contract and leases is de novo with no presumption of correctness accorded to the decisions of the courts below. *Angus v. W. Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000). With regard to findings of fact by a trial court, we review the record de novo and presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d).

-4-

**ANALYSIS**

## I. THE CONTRACT OF SALE: WHICH ASSETS WERE SOLD TO S&S?

The Holders contend the contract for sale is unambiguous and the contract made it clear that the assets sold to S&S were limited to those "more particularly described" on the Asset Lists, which were attached to both the contract of sale and bills of sale, identified as Exhibit B-1, for Hendersonville, and Exhibit B-2 for Gallatin. Further, the Holders insist that none of the items/assets in dispute on appeal were listed in any of the sale documents; thus, none of the items/assets in dispute were sold to S&S. Accordingly, the Holders assert they owned the disputed assets and that S&S breached the contract as well as the leases when it removed the bathroom fixtures, including the sinks, mirrors, and hand dryers, the Ansul fire suppressant system and exhaust fans, exit signs and emergency lights, menu boards, fire extinguishers, and a washer and dryer from the Hendersonville premises; and bowling lane beds, an Ansul fire suppressant system and exhaust fans, and menu boards from the Gallatin premises.

To the contrary, S&S contends it purchased the disputed assets. S&S relies, in part, on a catch-all phrase found in the two "bowling equipment" subsections of the contract of sale, specifically subsection (b) of paragraph 2.01, which pertains to Hendersonville, and subsection (b) of paragraph 2.02, which pertains to Gallatin. Each subsection, as follows, reads the same except for the name and address of the business and the value assigned to the bowling equipment:

> 2.01.b. Bowling equipment including, but not limited to, pin setters, lanes and automatic scorers, being more particularly described and on EXHIBIT B-1 attached hereto and made a part hereof, all other bowling equipment and *all other chattels and assets not otherwise specified herein and necessary to operate Hendersonville Fun Center and Circus World*, 460 W. Main Street, Hendersonville, Tennessee 37075, in the manner heretofore operated and valued by the Parties hereto in the amount of [$950,000.00].

> 2.02.b. Bowling equipment including, but not limited to, pin setters, lanes and automatic scorers, being more particularly described and on EXHIBIT B-2 attached hereto and made a part hereof, all other bowling equipment and *all other chattels and assets not otherwise specified herein and necessary to operate Gallatin Lanes*, 683 S. Water Street, Gallatin, Tennessee 37066, in the

manner heretofore operated and valued by the Parties hereto in the amount of [$350,000.00].

(Emphasis added.)

The Holders insist these two subsections only apply to "bowling equipment" and not to any of the other eight categories of assets listed within the contract, such as "furniture and fixtures" or "kitchen and bar equipment, ice rink, theater and other equipment." Further, the Holders rely on the principle of contract interpretation that the "particular and specific provisions of a contract prevail over general provisions." *See Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 794-95 (Tenn. Ct. App. 2009).

The trial court agreed with the Holders, finding that S&S purchased only the assets identified on the Asset Lists, described as Exhibits B-1 and B-2. The trial court also held that if the asset was not identified on the Asset Lists, then S&S acquired no interest in the asset. S&S contends this was error because, in addition to the assets specifically identified in the Asset Lists, it also purchased "all other chattels and assets not otherwise specified herein and necessary to operate" the businesses it purchased.

### A. ALL OTHER ASSETS NECESSARY TO OPERATE THE BUSINESSES

As we begin our analysis of this issue, we are mindful of the principle that the primary objective in the construction of a contract is to discover the intention of the parties from a consideration of the whole contract. *Allmand v. Pavletic*, 292 S.W.3d 618, 631 (Tenn. 2009). When resolving disputes concerning contract interpretation, we are to ascertain the intention of the parties based upon the "usual, natural, and ordinary meaning" of the contractual language. *Rainey v. Stansell*, 836 S.W.2d 117, 119 (Tenn. Ct. App. 1992). "All provisions in the contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions of a single contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) (citing *Rainey*, 836 S.W.2d at 118-19). "When ascertaining the intention of the parties to a contract, the court does not attempt to determine the parties' state of mind at the time the contract was executed, but rather their intentions as actually embodied and expressed in the contract as written." *Rainey*, 836 S.W.2d at 118-19 (citing *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955); *Sutton v. First Nat'l Bank of Crossville*, 620 S.W.2d 526 (Tenn. App. 1981)).

In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 889-90 (Tenn. 2002). The initial task in construing the contract at issue is to determine whether the language is ambiguous. *Id.* at 890. If the

language is clear and unambiguous, the literal meaning controls the outcome of the dispute. *Id.* If, however, the words in a contract are susceptible to more than one reasonable interpretation, the parties' intent cannot be determined by a literal interpretation of the language. *Id.* Contractual language "is ambiguous only when it is of uncertain meaning and may fairly be understood in more ways than one." *Id.* (citing *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190-91 (Tenn.1973)). Where there is no ambiguity in the contract language, neither party is to be favored in the construction of the contract. *Ballard v. N. Am. Life & Cas. Co.*, 667 S.W.2d 79, 83 (Tenn. Ct. App. 1983) (citing *Brown v. Tennessee Automobile Ins. Co.*, 237 S.W.2d 553 (Tenn. 1951).

S&S contends it purchased "all other chattels and assets not otherwise specified herein and necessary to operate [the businesses in the manner heretofore operated]," as stated in subsections 2.01(b) and 2.02(b) regarding bowling equipment. Thus, it contends the trial court erred in finding that it only purchased assets specifically identified in the Asset Lists.

The contract of sale and the Asset Lists specify several general categories of assets in 2.01 and 2.02 in addition to the category of Bowling Equipment. The additional categories include the following: Kitchen/Bar/Circus World Equipment; Furniture and Fixtures; Computers and Printers; Software; Vehicles; and Customer Lists. Notably, none of these other subsections include the catch-all phrase "and all other chattels and assets not otherwise specified herein and necessary to operate [the businesses in the manner heretofore operated]."

As noted above, in interpreting contractual language, we look to the plain meaning of the words in the contract to ascertain the parties' intent. *Planters Gin Co.*, 78 S.W.3d at 889. The catch-all phrase only appears in one category of assets, that for bowling equipment. Thus, by looking to the plain meaning of the words used by the parties, it is easy to conclude that the catch-all phrase only applies to the one category where it appears, that being the category of bowling equipment.

We have identified only one asset in dispute that can conceivably arise from the catch-all provision in 2.02(b): the bowling alley "lane beds" located at Gallatin Lanes, which we discuss in detail later.

We now turn our attention to the ownership of two assets that were not resolved by the foregoing discussion: the bathroom fixtures in Hendersonville and the "lane beds" in Gallatin, both of which were identified on Exhibit B-1 and Exhibit B-2, respectively.

B. BATHROOM FIXTURES AND ASSORTED CLEANING SUPPLIES

The seventeen bathrooms at the Hendersonville center are among hundreds of specifically identified assets or items listed under the asset category "Kitchen/Bar/Circus World Equipment" in Exhibit B-1 of the Asset List. A small sampling of the numerous items listed under the "FOOD AREA" subcategory of this section include:

| | |
|---|---|
| 6 | Two Seat Tables |
| 15 | Four Seat Tables |
| 1 | Humugus [sic] Soft Play Unit (3 Story) |
| 2 | All Play Unit |
| 2 | Shoe Rack |
| 3 | Benches |
| 1 | Ball Wash System (Soft Play) |
| 17 | Bathrooms (Men's & Women's) |
| | Assorted Cleaning Supplies |
| 23 | Blue Chairs |
| 1 | Skate Sharpener |
| 250 | Pair of Ice Skates |
| 1 | Microphone |
| 1 | Zamboni |

The assets at issue here are the bathrooms, which were listed in Exhibit B-1 as follows:

| | |
|---|---|
| 17 | Bathrooms (Men's & Women's) |
| | Assorted Cleaning Supplies |

In its Final Order, the trial court found that S&S only purchased the assorted cleaning supplies that were located in the bathrooms at the time of purchase and that S&S had not purchased the bathroom fixtures. Specifically, the court stated:

Bathroom fixtures - The asset list refers to bathrooms assorted cleaning supplies. [The Holders are] found to be the owners of all bathroom fixtures including commodes, sink, mirrors, stalls and hand drying equipment.[1]

_____

[1]The trial court also made findings regarding the damages; we omitted the trial court's award of damages in this section because we discuss damages in detail in a subsequent section.

S&S insists it purchased "the bathrooms," meaning anything and everything in the 17 bathrooms and, therefore, it had the right to remove what it purchased from the Holders at the end of the leases. When S&S vacated the premises, S&S removed all of the items listed above as well as toilet parts, bathroom sinks, mirrors, stall partitions, and hand dryers from the bathrooms. Not surprisingly, it is disputed whether the parties intended to include bathroom fixtures, particularly the toilet parts, sinks, mirrors, stall partitions, and hand dryers, in the sale of assets to S&S.

The Holders insist "the bathrooms" were not sold, only assorted cleaning supplies in the bathrooms. The Holders also assert that S&S not only took property belonging to the Holders for which they are entitled to damages, they also assert that S&S damaged the premises by removing the fixtures from the walls in violation of the leases. Paragraph 19 of both leases provide that S&S was not permitted to remove assets if their removal caused irreparable injury to or defacement of the leased premises.

The trial court held the language used by the parties regarding "the bathrooms" and "assorted cleaning supplies" created an ambiguity; thus, the parties were permitted to introduce extrinsic evidence to aid the court in ascertaining the parties' intent. *See Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611-12 (Tenn. 2006).

S&S introduced the deposition of Sandy Hansell, a national broker of bowling centers and the broker who negotiated the deal between S&S and the Holders, to support its claim. Mr. Hansell attested to the custom and practice of buying and selling bowling centers, stating that "the prevailing standard in our industry. . . is that when a business like this is sold, everything except the land and building is conveyed to the buyer because he needs everything that's there, every asset, chattel, item and so on, to operate the business." Mr. Hansell provided a letter from him to Mr. Holder advising him that, "If you have any personal assets in either center which would not be included in the sale, either remove them before [the potential purchaser] visits or be sure to point them out during the visit."

We note, however, as the trial court obviously did, that Mr. Hansell's testimony and the letter he introduced pertains to *personal assets*, which can be distinguished from *fixtures*. A fixture is "an article in the nature of personal property which has been so annexed to the realty that it is regarded as part of the land." *Keenan v. Fodor*, 2012 WL 3090303, at *6 (Tenn. Ct. App. July 30, 2012) (quoting Black's Law Dictionary (5th Ed.)). In general, everything that is affixed to the freehold becomes a part of the freehold. *Green v. Harper*, 700 S.W.2d 565, 567 (Tenn. Ct. App. 1985). However, there is an exception between landlord and tenant regarding "trade fixtures." *Id*. Those fixtures that are made for the purpose of carrying on a man's trade may be removed when the removal can be affected

without material injury to the freehold. *Id*. (citing *Cubbins v. Ayres*, 72 Tenn. 329, 331 (1880)).

In *Green v. Harper*, the lessor of property sued the lessee who removed certain additions and improvements the lessee had made to the leased premises, where the lessee operated a drive-in movie theater. On appeal, we held that the theater screen, theater marquee and car speakers, which the lessee had purchased and installed, were trade fixtures even though they were attached to the premises; thus, these trade fixtures could be removed by lessee. However, we held that light fixtures, commodes, and plumbing fixtures, which were attached to and a part of the freehold estate, were not fixtures that were peculiar to the operation of a drive-in theater; thus, they were fixtures that could not be removed. *Id.*

S&S provided no evidence upon which a reasonable person could find that the toilet parts, sinks, mirrors, stall partitions, and hand dryers, all of which were affixed to the building, were unique to the business operated by S&S. Thus, there is no evidence upon which to find that any of these bathroom items were trade fixtures. Because bathroom fixtures are necessary to operate *any* business and are not particular to the bowling industry, we find that the bathroom fixtures were not part of the sale to S&S.[2]

The trial court agreed with the Holders, determining that the Asset List did not transfer "the bathrooms," only the cleaning supplies in the bathrooms. We additionally find no merit to the assertion by S&S that toilet parts, sinks, mirrors, stall partitions, or hand dryers were unique to the operation of the Hendersonville Fun Center and Circus World. Accordingly, they are fixtures which remain with the freehold premises, not trade fixtures that may be removed by the lessee.

C. GALLATIN BOWLING "LANE BEDS"

Also at issue is the ownership of "lane beds" at Gallatin Lanes. Lane beds, also known as "particle boards," are the underlying foundation of bowling lanes.

---

[2]The foregoing notwithstanding, S&S would not have been permitted to remove some of these assets because doing so would have caused "irreparable injury to or defacement of the Demised Premises," which would have been a breach of the leases. Paragraph 19 of both leases provides in pertinent part:

> At or before the expiration or termination of the Lease, Lessee may remove all the trade fixtures including, but not limited to, all assets purchased under the Contract for Sale by and between Lessor and Lessee and owned by Lessee *that can be removed without irreparable injury to or defacement of the Demised Premises*[.] (Emphasis added.)

During the process of vacating the premises at the end of the lease, S&S had removed the bowling lanes from the Gallatin center, including the top part of the lane, the so-called "synthetic lane," and the underlying foundation, the "lane beds." When Mr. Holder learned that S&S had removed the lane beds, he contacted Larry Schmittou ("Mr. Schmittou"), the president of S&S, demanding that the lane beds be returned but not reinstalled. S&S complied with the request and simply placed the lane beds back into the lanes.

At trial, Mr. Schmittou admitted on cross-examination by the Holders' attorney that removing the lane beds, the particle boards, was a mistake:

> Q.     Okay. When the particle boards were taken out of the Gallatin bowling center, put out in your parking lot, to be packed up to take off, I assume, you came up and told Mr. Holder you made a mistake?
> A.     Yes, sir.
> Q.     And you put them all back in, or had them put back in?
> A.     Yes, sir.

The trial judge found that S&S admitted it should not have removed the particle boards, the lane beds. This finding is supported by the admission of the president of S&S that it made a mistake in removing the lane beds. Because the evidence does not preponderate against the trial court's finding, we affirm the trial court's holding that the lane beds were not sold to S&S.

Now that we have determined that S&S did not purchase any of the disputed assets, we turn our attention to the issue of damages, some of which arise from the wrongful removal of the disputed assets and others which arise from the alleged failure of S&S to fulfill its duties and responsibilities under the leases.

## II. RIGHTS AND RESPONSIBILITIES UNDER THE LEASE AGREEMENTS

The Holders contend S&S breached two major provisions of the leases. They contend S&S failed to maintain and keep all plumbing, sewage, electrical, HVAC systems, and light fixtures in as good repair as they were at the commencement of the lease, ordinary wear and tear excepted. They also contend S&S failed to completely vacate the premises by failing to remove all of its assets at the end of the lease, including very large items such as a Dynamax Motion Theater ("Dynamax"), a refrigeration unit for the ice skating rink, and an emergency generator.

S&S counters, insisting that it fulfilled all of its affirmative responsibilities under the leases. Additionally, S&S contends the lease excused it from having to remove its assets from the premises at the end of the lease.

## A. FAILURE TO MAINTAIN AND REPAIR THE PREMISES

During the lease term, S&S was required to maintain and keep, at its own cost and expense, all plumbing, sewage, electrical, HVAC systems, and light fixtures "in as good repair as same are at the Commencement Date." Upon the expiration of the lease term, S&S was required to surrender the premises "in as good condition and repair as the same shall be at the commencement of this Lease . . . ordinary wear and tear excepted."

### (1)    The HVAC Units

The items in dispute that come within the purview of these affirmative responsibilities include maintenance of heating, ventilating, and air conditioning units. Shortly before the expiration of the lease in 2011, the Holders hired Michael Derryberry to inspect the properties. He identified several HVAC units that needed repairs and two units that were not working, specifically a 3-ton unit that was without power and a 25-ton unit that was missing parts; it had apparently been dismantled for parts to use on other units. S&S repaired all but the two units to the satisfaction of the Holders; thus, when S&S surrendered the premises, neither the 3-ton unit nor the 25-ton unit worked.

At trial, S&S argued that the two HVAC units were not in working order at the time of sale; thus, they were in the same condition at the end of the lease. For the same reason, S&S also insists it had no obligation to put them in working order.[3]

In furtherance of its argument, S&S points to a pre-closing report by Republic Plumbing Heating & Cooling, which noted that three of the eighteen HVAC units in Hendersonville were not running. The report described the three units in need of repair, including one unit that "has been robbed of several key parts to fix other units and is not running and would half [sic] to be replaced or rebuilt to make it operable." This statement, however, had a line drawn through it, as if to remove it from the list.

---

[3] S&S also argues that it is not responsible for the replacement of capital items. However, the terms of the lease are clear in that "Lessee will keep, at its own cost and expense, maintain and keep the Demised Premises, including without limitation, all . . . HVAC systems . . . as clean and in as good repair as same are at the Commencement Date or may be put in during the continuance thereof, reasonable wear and tear . . . excepted[.]"

Mr. Schmittou testified that the unit that was not working was scratched off the report to confirm that S&S did not have to maintain or repair the unit. In addition, Boyd Cantrell, the head maintenance man for S&S who was previously employed by the Holders, testified that two units were not working in Hendersonville before the beginning of the lease. He identified them as the 25-ton unit over the ice rink that "appeared dismantled," and the 3-ton unit that was not connected to power; however, he acknowledged that he could not say if the Holders had repaired these units at lease commencement. Henry Burch, an owner of a refrigeration and air conditioning company, as well as an employee of S&S, testified that he was on the Hendersonville roof in 2003 and noticed that the 25-ton unit had been abandoned, and that the 3-ton unit was not connected to a power line. However, he too was not sure if these units had been in this condition at lease commencement in 2001.

The Holders insist that all the units were in good working order at the beginning of the lease. Noting that S&S had the opportunity to inspect the premises and bring any concerns to the Holders prior to closing, Mrs. Holder testified that during the 2001 inspection period, S&S notified them of the two units which needed repair, and that the Holders fixed them before closing.

In its Final Order, the trial court noted that the contract of sale provided for an inspection period in which the purchaser "shall have the right to inspect . . . and test all heating, plumbing and HVAC systems which SELLER shall warrant will be in good working order at closing." In addition, the contract also provided that:

> 5.03. All heating, air conditioning, plumbing and other electrical systems for the Businesses and Real Properties shall be in good working order at closing.

Moreover, S&S served notice upon the Holders in conformance with the inspection period requirements, showing the repairs that needed to be done, including the repair of several heating and air conditioning units. The First Amendment to the Contract of Sale reveals that the Holders agreed to perform the repairs outlined in the proposal from Republic Plumbing, including a large HVAC unit that had been stripped of parts, and the Holders testified the repairs were made to the units.

The trial court made the following findings regarding the condition of the two units at the commencement of the lease in 2001:

> The HVAC units were in good working order and accepted as such by [S&S] at lease commencement. The First Amendment to Contract of Sale occurred

in 2011[sic].[4] An inspection prior to closing indicated at Hendersonville a roof top 25-ton unit was missing parts and a roof top 3-ton unit had no power. Under the First Amendment, the Parties agreed [the Holders] would repair both units before closing. [Mr. Holder] testified he repaired and restored both units. The 25-ton unit was for the ice skating rink and the 3-ton unit was for the office. [Mr. Schmittou] claimed he and [Mr. Holder] agreed to "abandon both units." [S&S] admits using the ice skating rink served by the 25-ton unit for a few years after the lease began. [S&S] then replaced the ice rink with a roller skating rink. The Court finds the parts were removed by [S&S'] repair person after [S&S'] need for the Ice Rink unit ceased similar to the closing and parts removed from the bathrooms. At lease surrender, the 3-ton unit was without power and the 25-ton unit had missing parts.

Although the facts regarding the condition of the two units at the commencement of the lease are disputed, the evidence does not preponderate against the trial court's findings of fact that the two HVAC units at issue were in good working order and accepted as such by S&S at lease commencement. *See* Tenn. R. App. P. 13(d). Thus, as the lease required, S&S had the duty to maintain and repair all HVAC units on the premises and return the properties in the same condition as they were at the beginning of the lease, excluding reasonable wear and tear, the latter of which would require consideration of the age of the units, which the trial court did in awarding damages for S&S' failure to reasonably maintain the two units.

(2)    The Bathrooms

We previously determined that S&S did not purchase the bathroom fixtures, sinks, mirrors, hand dryers, and stalls, and it is undisputed that S&S had the affirmative duty to maintain and keep all plumbing, sewage, electrical, and other fixtures "in as good repair as same are at the Commencement Date." This affirmative duty obviously includes the bathrooms.

Mr. Holder testified that two of the Hendersonville bathrooms[5] were totally destroyed and gutted, resulting in missing parts and damage to the stall doors and ceilings. Mr. Holder

---

[4] The First Amendment to the Contract was entered between the parties in 2001.

[5] Mr. Schmittou and several of his employees testified that these two bathrooms in Hendersonville were near the front of the building and had been closed up after several instances of vandalism. The testimony revealed that these bathrooms were not used during the majority of the lease, as they were padlocked near the start of the lease-term.

stated that S&S used parts from these bathrooms to fix up other bathrooms in the center. In addition, Mrs. Holder testified that stall doors, sinks, mirrors, and dispensers were missing with sewage left in toilets. She also testified that some of the bathrooms in Gallatin had damaged doors that needed to be replaced.

Darrell Terry of Terry's Plumbing Service, who had twenty-five years of experience in plumbing repair work, testified that he examined all of the bathrooms in both properties and found that all of the bathrooms were neglected and that standard maintenance had not taken place throughout the building.

The trial judge held, and it is undisputed, that during the lease, S&S closed two of the Hendersonville bathrooms and took parts from the closed bathrooms to repair other bathrooms. The trial court also found that S&S failed to maintain and repair the other restrooms and plumbing throughout the building. The evidence in the record does not preponderate against these findings.

(3)    The Ansul Fire Suppressant System & Exhaust Fans

The Ansul fire suppression systems are located in the kitchen at both facilities. As witnesses for both parties explained, the Ansul system is a fire suppression system that is used in commercial kitchens; it is attached to the wall and connects to the hoods covering the grill. The exhaust fans, which are located on the roof, pull heat and smoke away from the grill and assist the Ansul system in preventing or minimizing fires.

We previously determined that S&S did not purchase the Ansul systems or the exhaust fans associated therewith; thus, S&S had the affirmative duty to maintain and keep this equipment in as good repair as it was at the commencement of the lease. However, it is undisputed that S&S removed the Ansul systems and exhaust fans in both properties when it vacated the premises.

Therefore, upon the expiration of the lease term, S&S breached both leases by failing to surrender the premises, specifically the Ansul system and the exhaust fans, in as good condition and repair as at the commencement of the lease.

(4)    Exit Signs & Emergency Lights

We previously determined that S&S did not purchase the exit signs and emergency lights. Moreover, it is undisputed that S&S removed these items when it vacated the premises. Thus, S&S breached the lease by not surrendering the premises in as good condition as at the commencement of the lease.

## B. Failure to Completely Vacate the Premises

The Holders allege that S&S breached the leases when it failed to completely vacate the premises by not removing all of its assets at the end of the lease, more specifically the Dynamax, the refrigeration unit for the ice skating rink, and an emergency generator. The Holders contend they sustained damages due to this breach because they incurred expenses to remove S&S' property.

The trial court awarded the Holders damages for S&S' failure to remove all of its assets, including $5,000 in damages for the cost of removing the Dynamax; $10,000 in damages for the removal of the refrigeration unit; and $650 for the repair of the emergency generator.

To determine S&S' duties to remove these items at the end of the lease, we must interpret the leases at issue. The interpretation of a contract is a question of law, *Guiliano*, 995 S.W.2d at 95, and issues as to interpretation and application of unambiguous contracts are likewise issues of law, the determination of which enjoys no presumption of correctness on de novo appellate review. *Doe*, 46 S.W.3d at 196. Therefore, the trial court's interpretation of a contract is not entitled to a presumption of correctness under Tenn. R. App. P. 13(d) on appeal. *Angus*, 48 S.W.3d at 730.

It is undisputed that S&S purchased the items at issue from the Holders; thus, S&S owned them and had the right to remove them. The question on appeal, however, is whether S&S had a duty to remove these items. The answer to this question is found in paragraph 19 in the leases.

Paragraph 19 of both leases provides:

At or before the expiration or termination of the Lease, Lessee *may remove* all the trade fixtures including, but not limited to, all assets purchased under the Contract for Sale by and between Lessor and Lessee and owned by Lessee that can be removed without irreparable injury to or defacement of the Demised Premises[.]

(Emphasis added.)

Paragraph 19 is unambiguous and clearly states that S&S *may* remove the trade fixtures and assets it purchased from the Holders; moreover, nothing in the leases requires S&S to remove its trade fixtures or assets at the conclusion of the leases. Thus, S&S, as

-16-

lessee, had the option to either remove these items or leave them. It chose to leave them, and we find no basis upon which to find that doing so constituted a breach of the leases or the contract of sale.

Because S&S had no affirmative duty to remove the trade fixtures or assets it purchased, there is no basis upon which to award damages against S&S for failing to remove the Dynamax, the refrigeration unit, and the emergency generator.

### III. DAMAGES

The trial court awarded the following categories of damages:

| | |
|---|---|
| Generator Repair - | $    650 |
| Exit Signs/Emergency Lights - | $ 2,400 |
| Bowling Lane Particle Board - | $ 17,262 |
| Plumbing repairs to restrooms - | $ 11,491 |
| Removal of Ice Rink Refrigeration - | $ 10,000 |
| Removal of Dynamax - | $ 5,000 |
| Electrical Repair of Kitchen Roof Exhaust - | $    717 |
| Ansul System Repair - | $ 2,403 |
| 25-ton HVAC - Replace | $ 6,600 |

In the foregoing discussion, we determined that S&S did not breach the leases or the contract for sale by failing to remove all of the trade fixtures and assets it purchased from the Holders. There being no breach of duty, we, therefore, reverse the award of damages for the Holders' cost to remove the Dynamax ($5,000) and the ice rink refrigeration ($10,000) in the aggregate amount of $15,000. We also reverse the award of $650 for repair to the generator. It is undisputed that S&S purchased the generator from the Holders; thus, S&S had no duty to repair what it owned. Moreover, we determined that S&S had no duty to remove what it owned at the end of the lease.

### A. PROOF OF DAMAGES

In addition to contending it did not breach any duty owed to the Holders, S&S contends, in the alternative, that if it is liable for any breach, the Holders are not entitled to damages because they failed to prove their damages.

Damages for breach of contract or lease are permissible even when the plaintiff is unable to prove the exact amount of those damages. *BancorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006) (citing *Provident Life & Accident Ins. Co. v. Globe*

*Indemnity Co.*, 3 S.W.2d 1057, 1058 (Tenn. 1928)). "All that an award for damages requires is proof of damages within a reasonable degree of certainty." *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985) (citing *Wilson v. Farmers Chem. Ass'n*, 444 S.W.2d 185, 189 (Tenn. Ct. App. 1969); *Acuff v. Vinsant*, 443 S.W.2d 669, 674 (Tenn. Ct. App. 1969)).

"The law does not require exactness of computation in suits that involve questions of damages growing out of contract or tort." *St. John v. Bratton*, 150 S.W.2d 727, 729 (Tenn. Ct. App. 1941). "While the amount of damages to be awarded in a given case is not controlled by fixed rules of law or mathematical formulas . . . the evidence upon which a party relies to prove damages must be sufficiently certain to enable the trier of fact, using its discretion, to make a fair and reasonable assessment of damages." *BancorpSouth Bank*, 223 S.W.3d at 230 (citing *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 703 (Tenn. Ct. App. 1999); *Wilson,* 444 S.W.2d at 189).

(1)     Gallatin Bowling "Lane Beds"

S&S disputes the award of damages resulting from its removal of the "lane beds" at the Gallatin premises. At the end of the lease, S&S removed the synthetic bowling lanes, the top part of the lanes, as well as the underlying foundation, the lane beds. The trial court found that S&S did not purchase the lane beds and that it breached the lease by removing them; accordingly, the trial court awarded damages in the amount of $17,262 to the Holders for the repair and replacement of the lane beds that were removed. S&S contends the Holders failed to prove damages with respect to the lane beds.

Mr. Holder, over the objection of S&S, testified to an amount purportedly charged by a third-party to reinstall the lane beds. The third-party's invoice was never admitted into evidence, and S&S argues that in order to prove damages, the Holders had to submit expert testimony regarding the necessity and reasonable cost of work to reinstall the lane beds, relying on *Nagle v. Wells*, 1990 WL 160909 (Tenn. Ct. App. Oct. 25, 1990).

The trial court disagreed, finding it was undisputed that S&S breached the contract of sale and lease by removing the lane beds and that it was necessary for the Holders to hire someone to reinstall the lane beds. The court, as the evidentiary gate-keeper, also found that Mr. Holder had been in the bowling industry since 1975, and that he was knowledgeable of the cost of repairs in this business. We have determined that the evidence does not preponderate against the trial court's findings, and, therefore, we affirm the trial court's award of $17,262 to the Holders.

(2)     The HVAC Units

The only witness to testify regarding the damage to the two HVAC units was Michael Derryberry, who inspected the properties for the Holders shortly before the end of the lease; he testified as an expert witness at trial. Mr. Derryberry stated that, due to the age of these two units, they should be replaced rather than repaired, and the cost to replace the 3-ton and 25-ton units would be $23,462.

In determining the damages for the two HVAC units, the trial court focused on Mr. Derryberry's testimony regarding the life expectancy of new HVAC units, which would be 10 to 15 years, and the age of the units on the property. Based upon these facts, the court determined that requiring S&S to provide new units would put the Holders in a better position than before the breach, which was contrary to the law of damages; therefore, the court elected to base its award on a depreciated value. Accordingly, the trial court awarded $6,600 in damages, which was slightly less than 30% of the cost to replace the units with new equipment.

Admittedly, an award of a lesser amount for the damages the Holders sustained due to S&S failure to maintain these two units would also be within the range of reasonableness; nevertheless, we cannot say that the amount awarded, which included a depreciation of more than 70% of the cost of replacement, was unreasonable under the circumstances. Accordingly, we affirm the award of $6,600 for failure to surrender the two HVAC units at the expiration of the lease in as good a condition as they were at the commencement of the lease, ordinary wear and tear excepted.

(3)     Ansul Fire Suppressant System and Exhaust Fans

It is undisputed S&S damaged the premises by cutting wires and removing the Ansul system and exhaust fans; nevertheless, S&S argues that there is no admissible proof regarding the reasonable cost of replacing the Ansul systems, the exhaust fans and repair of the wiring.

Chris Searcey, the Holders' electrical contractor, testified that S&S damaged the Holders' property due to the manner in which it cut electrical wires instead of properly disconnecting the wires to the Ansul system and exhaust fans on the roof. Mr. Searcey testified that he had to replace and reconnect the wires to the exhaust fans, charging the Holders $717 for electrical repair. Mr. Holder also testified that when S&S removed the Ansul systems from both properties, it destroyed the wiring, and, as a result, he paid $2,403 to replace the Ansul systems in addition to what he paid Mr. Searcey.

S&S argues that there is no admissible proof regarding the reasonable cost of replacing the Ansul systems. S&S contends that Mr. Holder's testimony that he paid a certain amount to replace the Ansul system is not sufficient to prove the reasonable cost of replacing it.

As previously discussed, the trial court found Mr. Holder was competent to testify regarding the costs of repairs necessitated by S&S' actions. Therefore, we find the evidence sufficient to affirm the $717 award for electrical repairs to the exhaust fans and the award of $2,403 for replacement of the Ansul systems.

(4) Exit Signs and Emergency Lights

Following remand from the first appeal, which was necessary because not all issues had been addressed prior to the first appeal, the trial court awarded $2,400 in damages to the Holders for repairs to sixteen exit signs and six emergency lights. In this second appeal, S&S contends the award is error, arguing that it constitutes awarding a new category of damages that was outside the scope of the limited remand to the trial judge. We respectfully disagree.

We remanded the case for the purpose of affording the trial court, and the parties, the opportunity to address and resolve all issues. In the second final order that followed, which is the subject of this appeal, the trial court explained that the $2,400 award of damages was inadvertently omitted from the first order due to a "failure in proof reading." Moreover, the record reveals that the Holders' expert electrical contractor testified at trial that he repaired the wiring for the exit signs and emergency lights for a fee of $2,400. He also testified that the repairs were needed due to the manner in which the signs and lights had been removed.

We have determined that the trial court did not go outside of the scope of remand, and there is competent evidence to support the award. We, therefore, affirm the award of $2,400 to the Holders for repair and replacement of exit signs and emergency lights.

(5) Damage to the Bathrooms

The trial court awarded the Holders $11,491 in damages for repair and replacement of the bathrooms. The award was based primarily on the testimony of Darrell Terry of Terry's Plumbing Service, who testified that he was asked by the Holders to examine the bathrooms in both properties and give an estimate for anything that needed repair. He testified that the bathrooms appeared to be neglected and that standard maintenance had not taken place throughout the buildings. Mr. Terry's estimate, totaling $11,491 for parts and labor for both leased premises, was introduced as evidence.

As stated previously, Mr. Holder testified that two of the Hendersonville bathrooms were totally destroyed, parts were missing, and there was significant damage to the stall doors and ceilings. Mrs. Holder also testified, she stated that stall doors, sinks, mirrors, stall partitions, and dispensers were missing from these two bathrooms. She also testified that the rest of the bathrooms in the Hendersonville premises were damaged. Furthermore, she stated that some of the bathrooms in Gallatin had damaged doors that needed to be replaced. Both testified that the restrooms were inoperable and that S&S failed to maintain and repair the plumbing.

S&S argues that the damages claimed should be considered reasonable wear and tear because Mr. Terry stated that many of the items listed in his estimate could be subject to ordinary wear and tear; however, Mr. Terry also testified that the bathrooms needed repair due to a failure to repair and maintain during the lease term.

According to the lease, S&S was required to maintain and keep "all plumbing" in "as clean and in as good repair as same are [at the beginning of the lease]," and the evidence does not preponderate against the trial court's findings that S&S failed to fulfill this obligation. There being no other credible evidence of the amount of damages sustained due to S&S' breach of the lease, we affirm the award of $11,491 in damages for repairs to the bathrooms.

(6)     The Dynamax, the Refrigeration Unit, and the Generator

We previously determined that there was no basis upon which to award damages against S&S for failing to remove the Dynamax, the refrigeration unit, and the emergency generator. We, therefore, reverse the award of $5,000 in damages for the cost of removing the Dynamax; $10,000 in damages for the removal of the refrigeration unit; and $650 for the repair of the emergency generator.

### III. ATTORNEYS' FEES

The parties dispute whether each is entitled to attorneys' fees according to the lease and contract terms; the trial court awarded the Holders reasonable attorneys' fees in the amount of $21,500, based on the terms of the lease.

To determine whether either party is entitled to attorney's fees, we must interpret the contract and lease at issue. The interpretation of a contract is a question of law, *Guiliano*, 995 S.W.2d at 95, and issues as to interpretation and application of unambiguous contracts enjoy no presumption of correctness on de novo appellate review. *Doe*, 46 S.W.3d at 196.

The Holders assert that they are entitled to an award of reasonable attorneys' fees pursuant to Paragraph 39 of the lease because they brought suit in order to enforce compliance with the lease agreements. That provision provides:

> 39. Costs and Expenses. In the event it becomes necessary for Lessor to employ an attorney or take any other action to enforce collection of the Rent or to enforce compliance with any of the covenants or agreements of Lessee herein contained, Lessee shall be liable for all costs and expenses, including without limitation reasonable attorney's fees, costs and expenses incurred by the Lessor in connection herewith.

Specifically, the Holders argue that S&S did not surrender the property in as good a condition and repair as existed at lease commencement, and thus, S&S is liable for the costs incurred by the Holders to make those repairs, as well as the Holders' attorney's fees incurred in enforcing compliance.

On the other hand, S&S argues that the key issue was whether the disputed assets belonged to S&S, which was governed by the contract for sale, and not the leases. S&S contends that it was entitled to recover attorneys' fees under certain provisions of the contract for sale, which obligated the sellers to indemnify the purchaser, including reasonable attorney's fees, from any breach of the representations or warranties contained in the agreement. We respectfully disagree on both counts.

The Holders prevailed on the ownership of all assets at issue; thus, they were the prevailing parties under the contract of sale. Moreover, although S&S prevailed on some issues arising under the leases, the acts and omissions of S&S substantially damaged the leased premises at both locations, and the Holders prevailed on most issues.

Because it was both necessary and reasonable for the Holders to hire legal counsel to enforce and protect their respective rights under the contract of sale and leases, they were entitled to an award of attorney's fees. Finding the Holders were contractually entitled to recover their attorney's fees, and finding no error with the amount awarded, we affirm the trial court's award of attorney's fees in the amount of $21,500 to the Holders.

As for attorneys' fees incurred on appeal, because each party has prevailed on substantive issues in this appeal, we have determined that neither party is entitled to recover attorneys' fees incurred in this appeal.

## IV. S&S' COUNTERCLAIM

In its Answer and Counterclaim, S&S alleged, *inter alia*, breach of oral contract to sell real property. Specifically, S&S asserts that the parties reached an agreement on all material terms of a sale to S&S of the Hendersonville shopping center. In reliance on that agreement, S&S made substantial improvements to the center in February of 2011, including spending $27,400 to install new HVAC equipment and $33,850 to install a new roller skating rink. S&S contends that these expenditures would not have been made in the absence of an agreement with the Holders to sell the shopping center to S&S. The trial court dismissed the Counterclaim finding that no agreement was ever reached.

On appeal, S&S contends that it is entitled to recover the expenses it incurred in reasonable reliance upon the Holders' promise to sell the Hendersonville shopping center. S&S relies on the testimony by Mr. Schmittou that an agreement of all material terms had been reached; Mr. Schmittou testified that the parties had agreed to a purchase price of $3,850,000, with the condition that S&S would continue to rent the Gallatin premises for five additional years at the current rental price. In addition, S&S introduced an email from the Holders to Mr. Schmittou, dated May 3, 2011. In that email the Holders wrote, "We will sale [sic] you Hendersonville for Four Millions [sic] Dollars and we will hold a note for One Million Dollars at 7% under the same payback schedule as your proposal and renew the Gallatin Lease for five years at $8,000 per month." Mr. Schmittou alleges that the Holders were reneging on the terms they previously agreed upon in their email. To the contrary, the Holders admit negotiating the potential sale, but vehemently deny any agreement was ever reached.

The trial court made the finding of fact that no agreement had been reached, oral or written. The only evidence of an agreement was that of Mr. Schmittou; however, the Holders denied that any agreement had been reached. The applicable standard of review requires us to presume the trial judge's findings of fact are correct unless the evidence preponderates otherwise. The evidence in this record does not preponderate against the trial court's finding; thus, we affirm the trial court's finding that no agreement was ever reached. *See* Tenn. R. App. P. 13(d).

In the alternative, S&S argues that it is entitled to recover the cost of the new HVAC equipment that it installed under quasi-contract and quantum meruit. We note, however, these issues were not raised in the pleadings or at trial and that S&S is attempting to raise these issues for the first time on appeal. Our courts have consistently held that issues not raised before the trial court are waived and will not be entertained on appeal. *Barnhill v. Barnhill*, 826 S.W.2d 443, 458 (Tenn. Ct. App. 1991); *see also Pearman v. Pearman*, 781 S.W.2d 585, 587-88 (Tenn. Ct. App. 1989); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983).

For the foregoing reasons, we affirm the dismissal of S&S' Counterclaim.

**IN CONCLUSION**

The judgment of the trial court is affirmed in part, reversed in part, and this matter is remanded for entry of judgment consistent with this opinion. One-half of the costs of appeal are assessed against the appellant and one-half against the appellees.

_____
FRANK G. CLEMENT, JR., JUDGE